IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 37207

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENTAL RIGHTS OF JANE DOE. | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) | 2010 Opinion No. 32 |
| Petitioner-Respondent, | ) ) ) | Filed: May 7, 2010 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JANE DOE, | ) ) ) | |
| Respondent-Appellant. | ) ) | |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County.  Hon. Carolyn M. Minder, Magistrate.

Judgment terminating parental rights, affirmed.

John C. DeFranco of Ellsworth, Kallas, Talboy & DeFranco, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Deena A. Layne, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Chief Judge

Jane Doe appeals from the magistrate court's decision terminating her parental rights due to neglect of her child.  Doe argues that the magistrate's decision was not supported by substantial and competent evidence.  We affirm.

## I.

## BACKGROUND

Doe gave birth to a son, J.M., on August 11, 2008.  About two months later, on October 29, 2008, Doe was arrested and charged with felony possession of methamphetamine with intent to deliver.  J.M. was in the car with Doe, where numerous drugs were found, when Doe was arrested.  J.M. was left in the care of Doe's relatives until Doe was released on bond in early December 2008, at which time she resumed custody of J.M.  At the request of the Idaho

Department of Health and Welfare (the Department), a detective in the Ada County Sheriff's Office met with Doe on December 11, 2008, to determine the circumstances of J.M.'s care. At that meeting, the detective declared J.M. in imminent danger because Doe had no permanent residence and was staying with a known methamphetamine trafficker, appeared to be continuing her lifestyle of methamphetamine use, and did not have a vehicle to transport J.M. in an emergency. J.M. was thereupon removed from Doe's custody and placed in foster care.

On December 31, 2008, the magistrate court entered an order giving the Department temporary custody of J.M., effective retroactively to December 11, 2008. On January 7, 2009, Doe stipulated to a finding of neglect and to placing J.M. in the legal custody of the Department for an indeterminate period. A case plan setting out tasks for Doe to complete in order to be reunified with J.M. was approved by the court on February 4, 2009.

On February 18, 2009, Doe was convicted and placed on probation for the October 29, 2008, drug charge. However, Doe was incarcerated on March 12, March 17 to March 30, and May 11 to June 9, 2009, for probation violations--including repeatedly testing positive for methamphetamine, not obtaining employment, and not obtaining stable housing. These violations ultimately led to the revocation of Doe's probation in June, and she was incarcerated on a "rider."[1] On May 11, the Department filed a "six-month" review of the progress toward reunification of J.M. and Doe. In this review, the Department recommended a "concurrent plan of termination and adoption as the primary plan with reunification secondary to termination." The recommended plan called for J.M. to be "placed in another permanent setting by December 2009 or returned to [Doe]." The Department then filed a petition to terminate Doe's parental rights on August 26, 2009. Following a trial, the magistrate court ordered termination on the grounds that Doe had neglected J.M. and that termination was in J.M.'s best interest.

Doe appeals, arguing that the magistrate court lacked substantial and competent evidence to support its conclusion that Doe's parental rights should be terminated because the court

---

[1] The term "rider" is commonly used to refer to the period in which a trial court retains jurisdiction for up to 180 days while the offender is in the custody of the Idaho Department of Correction and receives rehabilitative treatment and education with the goal of enabling the offender to become successful on probation. At the end of the retained jurisdiction period, the court may suspend the offender's sentence and place him or her on probation or may relinquish jurisdiction, allowing execution of the original sentence. *See* Idaho Code § 19-2601(4); *State v. Lutes*, 141 Idaho 911, 915, 120 P.3d 299, 303 (Ct. App. 2005).

"ignored critical facts." Specifically, Doe contends that because three witnesses testified at her termination trial that she may have the ability to parent once she has demonstrated a twelve to eighteen-month period of sobriety, because she has a strong bond with J.M., because she visited J.M., because she has worked hard to complete her case plan to make reunification a possibility, and because she has done well in her rider program prompted by her desire to reunify with J.M., the magistrate court erred in ordering termination of her parental rights.

## II.
## ANALYSIS

### A. Timeliness of Appeal

We must first address an argument by the Department that Doe's appeal should be dismissed because it was not timely filed. This appeal was taken directly from the magistrate division to the Idaho Supreme Court, bypassing an intermediate appeal to the district court.[2] This expedited process for appeals from orders terminating parental rights is authorized by Idaho Appellate Rule 11.1. Appellate Rule 12.2 specifies that such an expedited appeal must be initiated by filing a notice of appeal with the clerk of the district court "within fourteen (14) days from the date of issuance of the order." The Department argues that Doe's appeal did not comply with this time limit.

Following the trial in this matter the magistrate issued a November 18, 2009, "Order Terminating Parental Rights of [Doe]" in which the court made extensive and detailed findings of fact and conclusions of law ultimately determining that J.M. had been neglected and that termination of Doe's parental rights was in J.M.'s best interest. This decision said, "The parental rights of [Doe] as to [J.M.] are terminated," but also directed the Department to "prepare an order consistent with this opinion." The court subsequently issued a "Findings of Fact, Conclusions of Law, and Decree as to the Mother" on December 1, 2009, ordering termination of the parent-child relationship between Doe and J.M. Doe filed a notice of appeal on December 11, 2009. The Department asserts that Doe's appeal was not timely because the fourteen-day period for Doe's appeal began to run from the November 18, 2009, decision, not the subsequent "Findings of Fact, Conclusions of Law and Decree as to Mother" filed on December 1, 2009.

---

[2] The appeal was subsequently assigned to this Court by the Supreme Court.

A civil judgment, order, or decree generally must be final to be appealable as of right. I.A.R. 11(a)(1); *Camp v. East Fork Ditch Co., Ltd.*, 137 Idaho 850, 866-67, 55 P.3d 304, 320-21 (2002). A final judgment is an order or judgment that ends the lawsuit, adjudicates the subject matter of the controversy, and represents a final determination of the rights of the parties. *Camp*, 137 Idaho at 867, 55 P.3d at 321; *Watson v. Watson*, 144 Idaho 214, 217, 159 P.3d 851, 854 (2007). In order to avoid confusion about what written ruling may constitute a court's final judgment, Idaho Rule of Civil Procedure 58(a) requires that "[e]very judgment shall be set forth on a separate document." Thus, a judgment differs from the findings of fact and conclusions of law that must be rendered by a trial court at the conclusion of a court trial pursuant to I.R.C.P. 52(a). In addressing the distinction between an order for summary judgment and a final "appealable judgment," our Supreme Court recently said, "The judgment must be a separate document that does not contain the trial court's legal reasoning or analysis," and "merely typing 'It is so ordered' at the end of the memorandum decision does not constitute a judgment." *Spokane Structures, Inc. v. Equitable Inv., LLC*, ___ Idaho ___, 226 P.3d 1263 (Jan. 28, 2010). The Court added, "Obviously, the judgment that the court is to sign must be a document that is separate from the jury's verdict or the court's decision." *Id.* Whether a judgment, order, or decree is appealable is determined by its content and substance, not its title. *Camp*, 137 Idaho at 867, 55 P.3d at 321; *Watson*, 144 Idaho at 217, 159 P.3d at 854.

In the present case, the magistrate's November 18, 2009, decision clearly was not a final judgment set forth on a "separate document." It was, instead, a twenty-seven-page expression of the magistrate's findings of fact and conclusions of law and an announcement of the court's decision to grant the Department's petition. Despite its title, this "Order Terminating Parental Rights of [Doe]" did not purport to be the court's final determination, for the order itself concluded with an instruction that "the Petitioner is directed to prepare an order consistent with this opinion." A document separate from this expression of the court's findings and conclusions was both specifically contemplated by the court and necessary for compliance with I.R.C.P. 58(b).

The result of the district court's directive to the Department to prepare a final order was the December 1, 2009, document drafted by the Department and presented to the magistrate for

4

signature. It declares the rights of the respective parties with finality[3] and constitutes the final judgment from which the time for Doe's appeal began to run. As Doe's appeal was filed within fourteen days of that judgment, her appeal is timely.

## B. The Magistrate Court's Decision to Terminate Doe's Parental Rights is Supported by Clear and Convincing Evidence

We next consider Doe's argument that the magistrate court's findings and its conclusion that Doe's parental rights should be terminated are not supported by the trial evidence.

A parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). Consequently, a judicial decision to terminate a parent-child relationship must be supported by clear and convincing evidence. *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006); *Doe*, 137 Idaho at 760, 53 P.3d at 343. On review, this Court will uphold the trial court's findings if they were based on substantial and competent evidence. *Id*. Substantial and competent evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," even if the evidence is conflicting. *In re Doe*, 143 Idaho at 345, 144 P.3d at 599 (quoting *Folks v. Moscow School Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997)); *In re Doe*, 142 Idaho 594, 597, 130 P.3d 1132, 1135 (2006). The trial court is better positioned than an

---

[3] The December 1 decree concludes:

> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the parent-child relationship heretofore existing between [Doe] and [J.M.], child born to said parent on August 11, 2008, be and the same is hereby terminated, and henceforth said [Doe] and [J.M.] shall not sustain the relationship of parent and child, each to the other.
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the legal custody of the said [J.M.], child born to [Doe], on August 11, 2008, be and same [sic] is hereby vested in the Director of the Department of Health and Welfare, State of Idaho, and said Director is hereby appointed guardian of the person of said child, with the rights, including, but not necessarily limited to, the authority to authorize major medical, psychiatric, and surgical treatment; to represent said minor child in legal actions; to consent to the adoption of said child; to provide for the child's support; and to make any other decisions concerning the child which the child's natural parent could make.

appellate court to observe a witness's demeanor, assess credibility, detect prejudice or motive, and make character judgments. *State, Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 664, 182 P.3d 1196, 1198 (2008); *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991). Therefore, the facts, and reasonable inferences to be drawn from those facts, will be viewed in the light most favorable to the trial court's decision. *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009); *In re Doe*, 142 Idaho at 597, 130 P.3d at 1135.

The magistrate's decision in this case was based upon Idaho Code § 16-2005(1)(b), which provides that a parent-child relationship may be terminated when it is in the child's best interest and the parent has abused or neglected the child. A "neglected" child is defined in I.C. § 16-1602(25)(a) and (b) as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . or
> (b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . .[4]

The magistrate's finding of neglect under this definition is supported by substantial and competent evidence. Trial evidence shows that before the Department assumed custody of J.M., Doe had been unable to discharge her parental responsibilities and to give J.M. the care necessary for his health, safety, and well-being. Doe acknowledged using methamphetamine while she was pregnant with J.M., and she had the child with her in a vehicle containing illegal drugs when Doe was arrested for possession of methamphetamine with intent to deliver. When Doe was released on bail she again placed J.M. in danger by taking him to stay at least

---

[4]     Additional circumstances constituting neglect that are not relevant here are described in I.C. § 16-1602(25). Idaho Code § 16-2002(3) provides that neglect also occurs where "[t]he parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standard set forth in section 16-1629(9), Idaho Code." This standard is defined as when "a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care." I.C. § 16-1629(9). In this case, we evaluate the magistrate's finding of neglect based only on the definition set forth in I.C. § 16-1602(25)(a) and (b), as J.M. was not in the custody of the Department for the requisite time specified in I.C. § 16-1629(9) to fall within the I.C. § 16-2002(3) definition of neglect.

temporarily at the house of a known methamphetamine trafficker. Doe was homeless at this time and without any means to transport J.M. in an emergency. In January 2009, Doe stipulated that her actions, at least in failing to maintain a home for J.M., constituted neglect, and she agreed to placement of J.M. in the Department's custody for an indefinite period. Doe thereafter remained unable to discharge her parental responsibilities because she did not address her substance abuse problem through treatment, did not resolve her legal problems stemming from criminal charges, did not obtain and maintain a stable home environment, and did not obtain and maintain legitimate employment. All of these were tasks required of Doe by her case plan, in addition to requirements that she attend Department-approved parenting classes and submit to a psychological evaluation.

Contrary to Doe's assertion on appeal, the evidence shows that she did not "work hard" to meet these requirements. For example, in order to address Doe's substance abuse, the Department referred her to Michael Dickson, a chemical dependency program administrator, for treatment. Dickson testified that Doe did not contact him and did not respond to his phone calls from January 16, 2009, through February 20, 2009. On February 20, Doe appeared at Dickson's office unannounced and upset because she feared that she would be incarcerated again. Doe requested residential treatment, and after contact between Dickson, Doe's Department case manager, and Doe's probation officer, the decision was made to put her in residential treatment rather than incarceration. However, Doe checked out of the residential treatment program after just two days. She thereafter came to Dickson's office four times from March through May, always unannounced, and always in response to her perception that she was going to be incarcerated for violating probation terms. On each of these occasions, however, Doe failed to comply with Dickson's recommendations for treatment. Dickson scheduled three group therapy sessions and one follow-up session with Doe, but Doe did not appear for any of them. Throughout this period, Doe admitted to continued use of methamphetamine. Thus, Doe was shown to be unwilling or unable to remain drug-free or to undergo treatment even when threatened with incarceration and the loss of her parental relationship with J.M.

Doe also did not make progress to resolve her legal problems by complying with probation requirements. Doe's probation officer testified that she violated probation conditions by repeatedly testing positive for methamphetamine, by not obtaining employment, by not making herself available for drug testing, by changing residences without permission, and by

7

actively avoiding supervision. Neither did she take any steps to obtain and maintain a stable home suitable for J.M. Dickson, the chemical dependency program administrator, said he attempted to help with housing by suggesting "Safe and Sober housing" and "City Lights housing" but Doe did not want to live at either place "because of the perception or the feeling that she would be locked down." The evidence also shows that Doe did not obtain and maintain a consistent source of financial support or attend Department-approved parenting classes. And although she did participate in a psychological evaluation, this did not occur until after she was incarcerated for probation violations, and even then it was arranged through the Department's efforts, not Doe's efforts.

Overall, the evidence showed that until Doe was incarcerated in the rider program, where she was required to participate in certain education and treatment programs, she made no meaningful effort to complete the tasks required by her case plan and probation terms, which were designed to enable her to discharge her parental responsibilities. This is substantial and competent evidence to support the magistrate court's finding that Doe had neglected and continued to neglect J.M.

The evidentiary record also supports the conclusion that termination of Doe's parental rights is in J.M.'s best interests. Doe's behavior described above led the magistrate court to find that she continuously reverted into her old lifestyle of drugs and criminality when not incarcerated and that such behavior is not in the best interests of J.M. A parent's past criminal behavior is relevant in considering whether to terminate parental rights. *In re Doe*, 142 Idaho at 597, 130 P.3d at 1135. Doe had been using methamphetamine since she was fourteen years old. When she was nineteen, she was sentenced to prison for felony possession of a controlled substance. She was given an opportunity for rehabilitation on a rider, but committed a new felony, escape, as well as probation violations, resulting in Doe serving her sentence of incarceration. She was released on parole twice, but both times was sent back to prison for parole violations and was ultimately released in 2007. Just two years later, on February 18, 2009, she was convicted of possession of a controlled substance with intent to deliver. In the interim, she became pregnant with J.M. and continued to use methamphetamine before and after his birth. This history supports the magistrate's conclusion that Doe will likely continue to make choices that will endanger J.M., which is not in J.M.'s best interests, when she is not in a tightly controlled environment.

8

Although, as Doe points out, she was doing well on her second rider, substantial evidence supports the magistrate's finding that her performance on this rider was not as indicative of Doe's future behavior as was her extensive history of misbehavior when not in custody. A psychologist pointed out at the termination hearing that the rider program is a "different situation when you have no access to drugs and you're receiving some sort of intervention" than when one has the ability to obtain drugs. Other evidence showed that in the past after being released from a drug-free, controlled environment, Doe quickly returned to using illegal drugs and associating with other drug abusers. As noted above, the evidence shows that Doe made little or no effort to complete her case plan, apart from appearing for supervised visits with J.M. The magistrate court did not "ignore" the progress made by Doe in the strict confines of the rider program, but found such progress was outweighed by other behavior. No error in this finding is demonstrated by the evidentiary record. Likewise, the magistrate did not ignore evidence that Doe had a "strong bond" with J.M. Rather, there was conflicting evidence concerning whether a parent-child bond still existed or whether J.M. had bonded with his foster mother instead. Doe merely asks this Court to re-weigh the evidence presented to the magistrate and render different findings.

Although, as Doe points out, several witnesses testified that she may have the ability to parent after a prolonged period of sobriety and treatment, such testimony does not demonstrate that the magistrate erred in concluding termination is in J.M.'s best interests. Indeed, the tenor of these witnesses' testimony was that a twelve to eighteen-month minimum period of sobriety and treatment would be required before assessment of Doe's parenting ability would even be possible; they did not opine that Doe would be able to start parenting J.M. at the end of that period. The magistrate permissibly found from this evidence that Doe "will need long term and extensive substance abuse treatment and must exhibit a significant period of sustained sobriety after successful completion of treatment before she could possibly begin to learn any parenting skills. She needs long term psychiatric treatment, extensive individual counseling and must develop a network of support other than drug dealers." Moreover, the trial evidence provides no confidence that Doe would be able to remain sober for a twelve to eighteen-month period on her first attempt; her rehabilitation, if eventually successful, may require a much longer period during which J.M. would be left in foster care without the stability of a permanent home environment. The trial record amply supports the magistrate's determination that it is in J.M.'s

best interests to terminate Doe's parental rights so that J.M. can be given permanency and stability.

Our decision should not be understood, however, as a holding that a long recovery period for parents with substance addictions will alone always justify termination of parental rights. Indeed in other circumstances, the speed with which the Department sought termination of Doe's rights with just five months elapsing between the Department's taking custody of J.M. and its designation of termination as the primary plan, and eight months between J.M. entering custody and the Department filing a petition for termination--would weigh against termination in view of the fundamental right at stake and the legislative policy, expressed in I.C. § 16-1601, that the Department, "to the fullest extent possible, [is to] seek to preserve, protect, enhance and reunite the family relationship." Nonetheless, in this case, the magistrate could properly deem the brevity of the reunification effort justified by Doe's unremitting demonstration--by her actions and inaction while not incarcerated--that she would make no effort to reunite with J.M other than to exercise visitation. The evidence of Doe's longstanding high-risk lifestyle of drug use and crime when not incarcerated, which made her a danger to J.M.; Doe's lack of effort to comply with her case plan in order to reunify with J.M.; the extended time needed before Doe might become able to competently parent, and J.M.'s need for permanency and stability, all support the magistrate court's conclusion that termination is in J.M.'s best interests.

### III.

### CONCLUSION

Doe has shown no error in the magistrate court's findings and conclusions. Therefore, the magistrate court's decree terminating Doe's parental rights is affirmed. No costs or attorney fees to either party.

Judge MELANSON **CONCURS.**

Judge GRATTON **SPECIALLY CONCURRING**

I write to comment on the timing of the filing of the petition for termination in this case and its effect on the issue of neglect as the basis for termination. Doe objected to the termination proceedings as being premature, since the fifteen-month period set out in Idaho Code § 16-

10

1629(9) had not lapsed.[1]  The magistrate, citing Idaho Juvenile Rule 48, overruled the objection stating that proceedings could be initiated at any time.  My purpose here is simply to explore, particular to neglect as the basis for termination, the intersection of the time frames in the Child Protective Act (C.P.A.), I.C. § 16-1601, et seq., the Termination of Parent and Child Relationship statute, I.C. § 16-2001, et seq., and the associated Idaho Juvenile Rules.

At the front end of the termination time frame spectrum are cases involving "aggravated circumstances," as defined in I.C. § 16-1619(6)(d).[2]  The court may find aggravated circumstances at the adjudicatory hearing, conducted no later than thirty days after filing a petition invoking the jurisdiction of the court under the C.P.A.  I.C. § 16-1619.  Absent compelling reasons, a petition for termination in the case of abandonment or aggravated circumstances must be filed within sixty days of such determination.  I.C. § 16-1624.  Thus, in those egregious cases, a petition for termination is to be filed within ninety days of the initial C.P.A. petition.

Pursuant to I.C. § 16-1619(4), a child may come within the court's jurisdiction upon a finding of the existence of one of the grounds set out in I.C. § 16-1603, which includes a neglected child.  In this context, "neglected" is defined as:

> (25)  "Neglected" means a child:

---

[1]  In relevant part, Idaho Code § 16-1629(9) provides:  "There shall be a rebuttable presumption that if a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care, the department shall initiate a petition for termination of parental rights."

[2]  Aggravated circumstances involve egregious acts or omissions, defined in I.C. § 16-1619(6)(d) as:

> Reasonable efforts were not required as the parent had subjected the child to aggravated circumstances as determined by the court including, but not limited to: abandonment; torture; chronic abuse; sexual abuse; committed murder; committed voluntary manslaughter of another child; aided or abetted, attempted, conspired or solicited to commit such a murder or voluntary manslaughter; committed a battery that results in serious bodily injury to a child; or the parental rights of the parent to a sibling of the child have been terminated involuntarily and that as a result, a hearing to determine the permanent future plan for this child will be held within thirty (30) days of this determination.

(a)   Who is without proper parental care and control, or subsistence, medical or other care or control necessary for this well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . ; or

(b)   Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being.

I.C. § 16-1602(25).

In every case in which a child is determined to be within the jurisdiction of the court, a written case plan is to be prepared and filed with the court no later than sixty days after the child is removed from the home or thirty days after the adjudicatory hearing, whichever occurs first. I.C. § 16-1621(1). The case plan shall set forth reasonable efforts which will be made to make it possible for the child to return home and a concurrent plan for alternative permanent placement. I.C. § 16-1621(3). The case plan shall be approved by order of the court and, except in the aggravated circumstances situation, provide that reasonable efforts shall be made to reunify the family or, alternatively, complete the steps necessary for permanent placement. I.C. § 16-1621(4). A hearing to review the progress of the case and permanency plan shall be conducted at least every six months following the taking of jurisdiction by the court. I.C. § 16-1622(3). A hearing to review the permanency plan shall be conducted prior to twelve months from the date the child is removed from the home or from the date the court takes jurisdiction, whichever occurs first. I.C. § 16-1622(4).[3] Thus, from the filing of the petition, there is, generally, a thirty-

---

[3]     In *Idaho Department of Health and Welfare v. Hays*, 137 Idaho 233, 46 P.3d 529 (2002), the Idaho Supreme Court noted that the C.P.A. was amended in 1998 to conform to the requirements of the Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105-89. The Court stated:

> By adopting ASFA, Congress intended, among other things, to minimize delay in juvenile dependency proceedings, to reduce the length of time that dependent children stay in a temporary placement, and to increase the number of adoptions. Prior federal law had required States to make "reasonable efforts" to prevent removing children from their homes and to facilitate returning children to their homes if removal was necessary. The intent of that policy was to take all reasonable steps to enable the parents to continue to fulfill their childrearing obligation. Although ASFA does not abandon the reasonable efforts criteria, it provides financial incentives for states to implement procedures designed to expedite the permanent placement of children who are in foster care.

day period to the adjudicatory hearing, followed by another thirty-day period to the filing of the case and permanency plan, followed by review hearings at six month intervals and a permanency plan hearing by the end of one year. The purpose of the case plan is to identify and undertake steps necessary to create or restore a situation in which the child can be returned to his/her home and parental care. Reasonable efforts toward reunification are required by the C.P.A. The purpose of the concurrent permanency plan is to identify and undertake steps necessary to create an alternative permanent living arrangement for the child, should it be necessary.

If the child has been placed in the legal custody of the Department or under its protective supervision pursuant to I.C. § 16-1619, the Department may petition the court for termination of the parent and child relationship in accordance with chapter 20, title 16, Idaho Code. I.C. § 16-1624.[4] Termination may be granted if the parent has neglected the child and termination is in the best interest of the child. I.C. § 16-2005(a)(2). "Neglected," in this context is defined in I.C. § 16-2002(3) as:

> (a) Conduct as defined in section 16-1602(25), Idaho Code; or
> (b) The parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, *and* reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9), Idaho Code.

---

> Under ASFA, the child's health and safety is the paramount concern. 42 U.S.C. § 671(a)(15). The Act conditions federal funding upon a state's adoption of a system in which, among other things, the status of each child in foster care is reviewed periodically but no less frequently than once every six months, 42 U.S.C. § 675(5)(B); a permanency hearing is held no later than twelve months after the child is considered to have entered foster care, 42 U.S.C. § 675(5)(C); reasonable efforts to keep the child in, or return the child to, the home are not required in defined aggravated circumstances, 42 U.S.C. § 671(15)(C); and under specific circumstances the state is required to seek termination of the parental rights of the child's parents "and, concurrently, to identify, recruit, process, and approve a qualified family for adoption," 42 U.S.C. § 675(5)(E).

*Hays*, 137 Idaho at 237-38, 46 P.3d at 533-34.

[4]     *See also* I.J.R. 48 (if in accordance with chapter 20, title 16, Idaho Code and I.C. § 16-1624, a petition for termination may be filed "at any time.").

(Emphasis added.) Looking first to I.C. § 16-2002(3)(b), it is important to note that the definition of neglected incorporates the time standards of I.C. § 16-1629(9). The time standards become an element of proof, not just a rebuttable presumption regarding the timing of filing a petition for termination. Thus, in order for the Department to prove that the child is neglected under I.C. § 16-2002(3)(b), as I read the statute, it must demonstrate that reunification efforts were pursued for not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care. Significant to this case, while the magistrate also found the child neglected under I.C. § 16-2002(3)(a), the magistrate improperly determined the child to be neglected under I.C. § 16-2002(3)(b) since it is undisputed that a minimum of fifteen (15) months had not elapsed from the time the child entered shelter care to the filing of the petition for termination. [5]

Turning to I.C. § 16-2002(3)(a), the definition does not expressly incorporate the time standards of I.C. § 16-1629(9) within the definition of neglected itself. The question, then, is whether the time standards of I.C. § 16-1629(9) apply to a case brought under I.C. § 16-2002(3)(a) in such a way as to effectively require the Department to demonstrate that reunification efforts were pursued for not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care. I agree with the lead opinion that, by its terms, it does not. Consistent with underlying federal mandates, Idaho Code § 16-1629(9) implements a back-end time frame within which petitions for termination must be filed. [6] As

---

[5]     Thus, in this case, we analyze only the determination of neglect under I.C. § 2002(3)(a).

[6]     The genesis of I.C. § 16-1629(9) is ASFA's 15/22 requirement codified at 42 U.S.C. § 675(5)(E). It provides:
   (5) The term "case review system" means a procedure for assuring that--
      (E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by

14

adopted in Idaho, the section creates a rebuttable presumption that if the child has been in shelter care for fifteen (15) out of the last twenty-two (22) months, the Department shall file a petition for termination. It does not, expressly, preclude filing a petition for termination prior to the fifteenth month.[7]

---

another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless--

(i) at the option of the State, the child is being cared for by a relative;

(ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or

(iii) the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts of the type described in section 671(a)(15)(B)(ii) of this title are required to be made with respect to the child.

[7] However, as noted in the lead opinion, since reasonable reunification efforts must be demonstrated, the brevity between placement of a child in shelter care and filing of a petition for termination, would weigh against termination. Indeed, the purpose of termination is to provide permanency "where the court has found the existence of aggravated circumstances or that reasonable efforts to return the child to his or her home have failed." I.C. § 16-2001(b). Reasonable efforts to return the child home should be consistent with "the philosophy that wherever possible family life should be strengthened and preserved." I.C. § 16-2001(2).